# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-CR-0060-002-CVE |
| ) | |
| JULIA CANTRERAS-CANO, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Now before the Court is the motion to suppress (Dkt. # 45), filed by defendant Julia Cantreras-Cano. Cantreras-Cano seeks to suppress statements she made on January 21, 2005 regarding the location of firearms and controlled substances, and the evidence seized as a result of her statements. On May 24, 2006, the Court held a hearing on defendant's motion. Plaintiff called two witnesses: Officer Wolthuis of the Tulsa Police Department, and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent McFadden. Defendant called her daughter, Julia Isabel Amador ("Amador").

### I.

On January 21, 2005, at approximately 6:27 a.m., Tulsa Police Officers executed simultaneous search warrants for controlled substances on defendant's residence[1] and place of business.[2] Defendant was at her home when the police arrived to serve the search warrant. Upon their arrival at the residence, twelve officers knocked and announced "Tulsa Police. Search

---

[1]   7137 E. Independence, Tulsa, Oklahoma.

[2]   Julia's Bar, 1060 S. Mingo, Tulsa, Oklahoma.

Warrant" several times, according to police testimony. No one answered the announcements or opened the door. Officers breached the front door with a ram and with guns drawn. It is customary, for safety reasons, for officers to have weapons drawn when they breach a door. Upon entering the home, officers testified that they saw defendant standing in the hallway. In addition to defendant, her co-defendant and husband Cecilio Somonte-Aguirre ("Somonte-Aguirre"), her 16-year-old daughter, her 4-month-old grandchild, her 9-year-old son, and her mother-in-law were also present in the home. All occupants were ordered to sit on couches and chairs in the central room. After all residents were secured, all weapons were holstered and Wolthuis removed his police vest.

Plaintiff and defendant present different stories with regard to who was handcuffed during the search. According to defendant, police handcuffed Somonte-Aguirre and Amador and ordered defendant, who was holding her grandchild, to sit on the couch with Somonte-Aguirre and Amador. According to plaintiff, Wolthuis ordered another officer to handcuff defendant, with her hands in front, and Somante-Aguirre, with his hands behind. Wolthuis testified that he knew the identities of the defendants from previous surveillance tapes. This inconsistency is insignificant for purposes of whether defendant's statements were given voluntarily, as plaintiff concedes that defendant was in custody during the search. However, this discrepancy goes to witness credibility.

Wolthuis testified that he could not remember explaining the contents of the search warrant but believed that he delivered a copy of the warrant to one of the co-defendants. Amador testified that no copy of a search warrant was delivered during the search. Both Amador and McFadden testified that Wolthuis identified and explained the search warrant to the occupants. The officers seized cash (approximately $3100) and a small amount of cocaine from defendants' bedroom. The officers brought these items from the bedroom to a central location for packaging. At this point,

plaintiff alleges that Amador told Wolthuis that her mother wanted to speak to him, while defendant alleges that officers initiated questioning and intimidated her into making statements. Both officers testified that it was clear from defendants' body language that they did not speak English or were not comfortable doing so. Wolthuis testified that officers attempted to get an official translator quickly, but it was not until defendants were at the police station that Officer Khali, who had been off duty at the time, was able to be present and translate. A language barrier existed between officers and defendants throughout the search and Amador, who finished five years of schooling in the United States, assisted in translation. She testified that she translated everything said between her mother and Wolthuis to the best of her ability.

According to defendant, police officers repeatedly asked her questions about the location of drugs and threatened to have the state take away her grandchild and son if she did not cooperate. Dkt. # 45, at 3 ("She was not only interrogated by forceful, direct and express questioning, her obvious love for her grandchild was exploited by the use of intimidating threats about actions that would be taken if she failed to comply with the police officers' demands."). Amador testified that Wolthuis initiated questioning of both defendants, beckoned her mother into the kitchen, stated that things would be easier if she cooperated, and threatened to take away the children.

According to plaintiff, officers used a conversational tone at all times during the search and defendant volunteered statements. Wolthuis testified that Amador told him that her mother wanted to speak with him in the kitchen and, with Amador translating, defendant offered to Wolthuis that she would reveal the location of her cocaine if he would hide the investigation from her mother-in-law because defendant did not want to shame the family. Wolthuis testified that he never said anything about having any children taken away and that defendant appeared happy and Amador

appeared matter-of-fact about her role as interpreter.  He also testified that he did not question Somonte-Aguirre at any time during the search.  Plaintiff denies that officers initiated questioning, that they were forceful, or that they threatened to have the state take away defendant's child or grandchild.  Both officers testified that, after residents were secured, Wolthuis used a casual tone of voice.

It is undisputed that, during the course of the search, defendant told officers that drugs were located in a red toolbox in her cousin' apartment.[3]  Officers and defendant traveled to the cousin's apartment where her cousin allegedly consented to a search of the toolbox.  Wolthuis testified that Amador did not accompany him to the cousin's apartment but that defendant directed him there with the use of hand gestures.  However, Amador testified that she did accompany Wolthuis and her mother to the apartment.  Officers confiscated a significant amount of cocaine (approximately 195 grams), portable electronic scales, Inositol powder, plastic bags, and a pistol from the toolbox.  Officers also found paperwork for a storage unit under Somonte-Aguirre's name.  It is undisputed that defendants consented to a search of the storage unit, which contained two pistols, one shotgun, and ammunition.  Defendant's motion to suppress and evidence raised at the hearing did not challenge the evidence seized from the storage unit.

Plaintiff concedes that defendants were not Mirandized until after officers searched their home and the cousin's apartment.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  Officer Khali, who speaks fluent Spanish, Mirandized both defendants when they arrived at Unit Division East.  According to plainitff, both defendants agreed to speak with officers after being Mirandized and offered the following information: Cantreras-Cano told officers that she and Somonte-Aguirre had

---

[3]   706 S. 101 E. Ave., # 68, Tulsa, Oklahoma.

purchased cocaine fifteen days before the search, that they sold cocaine, that they were both illegal immigrants from Mexico, that they stored their cocaine in the toolbox at her cousin's apartment, that the gun was for protection when working at the bar, that they borrowed people's social security numbers to open business and personal accounts, and that the money seized from her home was from drug sales; and Somonte-Aguirre told officers that he had bought cocaine on January 17, 2005, that he sold cocaine, that he occasionally stored cocaine in the toolbox at defendant's cousin's apartment, and that the money seized from the home was from drug sales.

The narrow issue presented by defendant's motion to suppress is whether defendant's statements at her home were voluntary admissions or the product of interrogation.

## II.

For <u>Miranda</u> to trigger Fifth Amendment protection, a defendant must be subject to custodial interrogation. 384 U.S. 436. As it is undisputed that defendant was in custody while officers searched her home and had not yet been read her <u>Miranda</u> rights, the question is whether she was subject to interrogation. "Interrogation" refers not only to express questioning, but also to police statements and acts (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980) (defendant's statement about the location of a shotgun was volunteered, despite the statement being in response to a conversation between two officers regarding the safety of handicapped children in relation to the missing gun). Whether a defendant's statements were voluntary is determined by the totality of the circumstances. <u>Clanton v. Cooper</u>, 129 F.3d 1147, 1158-59 (10th Cir. 1997) ("The central consideration in determining whether a confession has been coerced always involves this question: did the governmental conduct

5

complained of bring about a confession not freely selfdetermined?"); U.S. v. Fountain, 776 F.2d 878, 885 (10th Cir.1985) ("[T]he Fifth Amendment . . . prohibits the admission of incriminating statements obtained by Government acts, threats or promises which permit the defendant's will to be overborne and thus rendered involuntary.").

Under plaintiff's version of the facts, Wolthuis used a "laid back" tone, defendant was comfortable, if not "happy," and Wolthuis asked no questions but rather listened and responded to information freely given. See U.S. v. Torres-Guevara, 147 F.3d 1261, 1266 (10th Cir. 1998) (admitting defendant's statement that "this was my first time" in relation to a drug arrest because the statement was spontaneously volunteered and not in response to any interrogation, despite the fact that defendant had not yet received her Miranda warnings); U.S. v. Godfrey, 409 F.2d 1338, 1339 (10th Cir. 1969) ("Appellant's statement was not the result of an improper compelling influence, despite the element of custody, and the trial court properly admitted the statement in evidence"). Thus, defendant's statements are admissible if she initiated the conversation with Wolthuis and offered her statements in exchange for his agreement to not disclose the investigation to her mother-in-law.

Under defendant's version of the facts, defendant was "scared" and Wolthuis forced her to reveal incriminating information by threatening her relationship with her children and grandchildren. See Arizona v. Fulminante, 499 U.S. 279, 286-87 (1991) (confession coerced where informant threatened defendant with violence and promised defendant protection from inmate violence).

**III.**

"The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." United States v. Long, 176 F.3d 1304, 1307 (10th Cir.1999). In the instant case, the Court must decide whether Wolthuis or Amador was more credible and, thus, which version of the facts is more credible.

On cross-examination, Amador admitted that she did not want to see her mother in trouble or in jail. She also testified to contradictory versions of events in relation to her child, whether the baby cried, who was holding the baby, and where the baby was at different times. For example, Amador testified that as she was leaving the house to accompany Wolthuis to the cousin's apartment, her baby was placed on Somonte-Aguirre's lap. Given that Somonte-Aguirre's hands were cuffed behind him, placing a 4-month-old baby on his lap was unreasonably dangerous. Nevertheless, Amador maintained that her baby was on Somonte-Aguirre's lap as she left the house. Additionally, it appeared to the Court that Amador was trying to diminish her relative fluency in English, as she hesitated to answer questions in English about her name and schooling but, when prompted, did so with sufficient vocabulary and grammar. Amador immediately placed her credibility at issue when she initially denied speaking with her older brother in the courthouse hallway prior to testifying, in violation of the Court's admonition after Fed R. Evid. 615 was invoked, only to recant that statement and admit that she spoke with him about matters not concerning the case.

Wolthuis has been with the Tulsa Police Department for approximately seven years and has executed over a hundred search warrants. Agent McFadden has been with the ATF for approximately four years. Both Officer Wolthuis and Agent McFadden offered a contrary account

of whether Amador was handcuffed and the tone of voice that Wolthuis used. McFadden described Wolthuis' tone as calm and passive. On cross-examination, Wolthuis maintained that it was defendant, not Amador, who was handcuffed and that Amador held the baby. He testified that he did not use any profanity and that he believed that defendant was not "scared."

The Court finds persuasive the testimony of the two officers that police holstered guns once residents were secured and that officers took a polite and calm tone given the presence of children and the desire to inspire trust in the hope that a resident may want to cooperate with the investigation. The evidence offered at the suppression hearing supports a finding that defendant initiated a conversation with Wolthuis and volunteered her statements on January 21, 2005.

Next, defendant does not argue that she has standing to directly challenge the search of the red toolbox, but rather she asks the Court to suppress the cocaine and the pistol in the toolbox as fruit of the poisonous tree. Wong Sun v. U.S., 371 U.S. 471, 487-88 (1963). As the Court has determined that defendant volunteered information to officers, there was no "primary taint." Id. The fruit of the poisonous tree doctrine "does not apply to confessions obtained after an initial confession that was voluntary but not preceded by Miranda warnings." U.S. v. Perdue, 8 F.3d 1455, 1468 n.7 (10th Cir. 1993) (citing Oregon v. Elstad, 470 U.S. 298 (1985)).

**IV.**

**IT IS THEREFORE ORDERED** that defendant Julia Cantreras-Cano's motion to suppress (Dkt. # 45) is hereby **denied**.

**DATED** this 30th day of May, 2006.

*[signature: Claire V. Eagan]*
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT